Our next case v. TETRA PAK Thanks for helping me. Let me see that. I never did find it anywhere. She's talking about this thing right here. That's all I saw last night. We couldn't find it either. Oh, look what we've got here. They brought one along with them. Oh, yeah. A lot of fun. I don't know how the world works anymore. Pull the grill. If you scratch the table, you lose. Mr. Fredricks. Good morning, your honors. We're here this morning because the district court ruled as a matter of law that the concave cutting edges which are on the underneath side of this blade assembly and the convex stirring edges you see on the top side of the blade assembly on the table in front of you are equivalent to a claim requiring that the cutting and stirring edges each be disposed in a generally common plane which is essentially a flat surface like the table on which it rests. Why do you say that a generally common plane is a flat surface? It's a geometric definition that a plane is a flat surface. There is nothing in the prosecution history or in the patent specification that suggests that a plane was meant to be anything other than meet the geometric definition of a flat surface. Unless it's generally. Correct. We acknowledge that generally adds, permits some degree of deviation from an absolute flatness. We don't contest that which is why, for your honor, we do not contest and we're not challenging the district court's claim construction of the phrase generally common plane. But all we have to have is a plurality in the same plane. I could shoot even a flat plane. I'd get it more if I used a generally flat plane and curved it a little. But I could shoot a flat plane anywhere through that curved surface and I'd get a plurality of edges that are within the plane. And that would literally satisfy the claim. I have two responses to that, your honor. The first is I think it's improper to have the generally common plane only apply to a subset of the blades that are shown as part of the blade assembly. Well, does it require all? It requires a plurality. That's correct, your honor. That plurality means? More than one. Yeah, that's what I thought. Yeah. But, your honor, before the amendment adding the generally common plane limitation, the claim required a plurality of cutting edges. It's our belief and it's our assertion that when the generally common plane limitation was added, that defines and applied to all of the blades, all of the plurality, not just a subset of the plurality. If the applicant intended to only apply to two or more of the cutting edges, they could have said a plurality of cutting edges, two or more of which are disposed in a generally common plane. Nothing in the specification. But they said that with the language they use. They say a plurality in the same plane. Well, nothing in the specification. The disclosure in the specification shows only a single embodiment in which, as far as can be determined from inspecting it and looking at it, it is they are all in the same plane, every single blade. Let's look at the doctrine of equivalence. Before, can I? Oh yeah, go ahead, sure. And I also dispute your suggestion, Your Honor, that any two of the cutting edges are in a common plane. I'll talk about the stirring edge since they're on the top. Sure. This edge, even looking at one edge, this edge is in a single plane, vertical. None of the other edges, stirring edges, are in that same vertical plane or anywhere near it. You realize what I'm doing is shooting a hypothetical plane at any point through where I would capture at least four, but I would guess I'd catch more edges than that. But you would catch points. You would not catch the blade surface. I would catch the surface. I'd catch the edge. But, Your Honor, what the claim requires is that the cutting edge be entirely disposed in a plane. It does not say that points of the cutting edge can be found in a plane. It also doesn't say entirely. So either way, we're adding things to the claim. But let's come back to the doctrine of equivalence, which is where the district court went. And, of course, you say that's precluded by the prosecution history, and that gets us into the exception for unforeseeable advances in art. Correct. This is new, never been used before, not used in the prior art, not used until considerably after patent issuance. It's new prior art. It's unforeseeable. It's new art. It's unforeseeable, therefore fits well within the exception the district court has sustained. What's wrong with that line of reasoning? Well, Your Honor, it is true that something that is in the prior art is more likely to be found to be foreseeable, but I've not found any requirement in the law that something must be outside of the prior art in order to be unforeseeable. Okay. Tell me why one, when it took, what, 11 years after patent issuance for you to come up with this, why is it so foreseeable? If it was, you would have done it the first six months. Well, I think that is the same essential timeline that occurred in the Honeywell case, I believe, Your Honor, where the accused equivalent was developed several years after the patent issuance. And the court said that does not necessarily make it foreseeable. The only evidence in this record is that it was not in the prior art. It would not have been a monumental task to have somebody skillful. Well, no one had done it. What foreseeability means, I can see that easily, and how can you? Well, let me address that in a couple different ways. There clearly is one form of unforeseeability that is an earth-shattering advance. If somebody claims an electronic vacuum tube before the transistor was invented, that clearly was something that could not be conceived of. That's a fairly easy example. Or a curved blade at a time when the art had forever used flat blades. Well, there are two more responses to that, Your Honor. One is that by the claim construction of plain, generally common plain advanced by Tetra Pak, they say just looking at the word, at that language, one skilled in the art would contemplate a curved cutting surface. So by their own argument in this court, they're acknowledging that one skilled in the art could easily foresee a curved cutting surface. I bet their argument will change now. We'll see, won't we? Yeah, we won't. Please go ahead. The second point is, this is really a relatively simple structural structure. By the way, isn't it true you went to that only after you had the patent in front of you? That's correct. And so you were designing around, you were creating a new entity and invention even. Correct. Unforeseeable. We believe so. No, I'm sorry. You don't mean that. I don't mean that because it is not the same standard. But we did design around it and we designed around the claims in reliance on the language found in the patent and in the prosecution history. You might have a problem with that if I say the edges are on a single plane because that would be literal. But if that's the court's conclusion, I can't argue much around that. But the point I wanted to make, Your Honor, is this is a relatively simple mechanical structure and I believe it's readily foreseeable for a skilled patent draftsman when he's looking at a claim that says a cutting edge. And for some purpose of patentability that we can't determine from the record, he says in order to get this claim allowed, I'm going to have to call it, whether you want to call it a straight cutting edge, a planar cutting edge, I'm going to add a limitation that says this cutting edge has to be in a plane. It's not, it's readily foreseeable to a skilled patent draftsperson that somebody might try to get around that by choosing a different shape. Much as if a patent called for a circular element. Have you filed an application on that? Yes, we have. That's interesting. You think it's invented. You think it's something no one would have thought was obvious or anticipated. So that kind of says it's unforeseeable, doesn't it? They're not the same standard, Your Honor. They are. I can see that. Go ahead. And my point was that somebody who adds a specific limitation to a structural device can easily foresee that somebody might choose, once you've staked out your claim, might choose a different path around the language that you've claimed. So that would make it, I believe that would help make it foreseeable. Counsel, I guess what I'm having trouble with, and perhaps you can help me, is the reason for the narrowing amendment must be discernible from the prosecution history. And I see where the amendment was made, but can you help me with why this amendment was made? Can you point me in the prosecution history as to why? No explanation from the applicant, no. None whatsoever, Your Honor. And at this stage, when we're talking about rebutting the presumption of prosecution history estoppel, that's the burden that is on the plaintiff, the patentee, is to point to somewhere in the record where they left a trail of breadcrumbs to say this is why we added that amendment. Now, I will concede that we made some suppositions in arguing a different claim construction for agitator panel and tried, in essence, to divine some tea leaves from what was available in the prosecution history to come up with, to propose and suggest a different construction for agitator panel, but that's a different context than the burden here where the burden is on the patentee to demonstrate where in the record they explain the rationale. And without having explained and provided a rationale in the prosecution history that they left behind for the public to see and use and rely on, they can't take advantage of the exception de festo. If I may, real briefly, Your Honor, since I see I'm in my rebuttal time, I just want to address if you get to the issue of equivalence. The real invention here is the unique way in which this stirs and cuts. You use that, right? We do? Yeah. Please, go ahead. I disagree with the assumption that it was, in fact, a totally unique way, but we've addressed that in our invalidity argument. Yes, you have. That's right. But I'd like to just touch real quickly on the evidence of equivalence for the court so that even if you're not persuaded by prosecution history, for example, or the all elements rule, there is no evidence from the plaintiff's, from Tetra Pak's expert that was, that would meet the exacting standards of addressing either function away result or insubstantial differences. The plaintiff's expert never even saw the accused cheese vat in operation. So he could observe the blades interacting with the coagulum, which is the liquid way and mixture in the vat. We submit that if you measure the evidence from their expert against the expert in the Mike and Composites case, he falls even short of that, in which case this court held that the evidence was insufficient to sustain the patent donor's burden of proving infringement under the doctrine of equivalence. And finally, even if the court concludes that that gets over the initial hurdle, the court was wrong in totally disregarding our expert testimony, which was no less reliable than the testimony offered by Tetra Pak's expert. But didn't that rejection come about because your expert did not test the theories that he testified about? Testing is not a requirement for an expert opinion. Maybe it's something that goes to credibility, Your Honor. Our expert did observe our cutting blades and how they interacted with the coagulum and compared it visually to how straight cutting blades interact with the coagulum, which is something that Tetra Pak's expert never did. His conclusions were solely drawn based on his assumptions about how the cues were able to work rather than actual observations. I'm almost out, so I'd like to save some time if I could. Mr. Fredrickson, we'll restore your entire five minutes and give Mr. Hirshhorn 20 if he needs to use it. Thank you, Your Honor. Good morning, Your Honors. Philip Hirshhorn, Buchanan Ingersoll for the appellee Tetra Pak parties. May it please the Court. Your Honors, let me start with some of the questions that you've asked and really gone into this issue of, first, the claim construction and how it applies to this particular device. When we look at that, we have the district court judge looking at the record evidence before her in terms of summary judgment. She's given a claims construction. She applies it to the device that's before you and all the other elements that are part of the proof of record. What Tetra Pak believes is that fundamentally the judge's opinion on infringement and the judge's opinion on finding no invalidity was correct. And it was correct because when you look at the device, first let's deal with the infringement aspect. All of the elements, and in fact I think my colleague conceded that all of the elements are in the CSI cheese bag. And really that's what the judge's opinion was with respect to doctrinal equivalence and really could have been with respect to our argument was at the district court level for literal infringement. That really you could have a finding of literal infringement against this device. How do you find literal infringement? I think, Your Honor, I think with the idea that the surface could be planar between the plurality of the edges. And I think when you get back to we had a claims construction argument. Plane means flat. How do you do it? Even if you do that, I think Your Honor had it just right. And I think it's really just if you lay plain on that, if that's what you're talking about, if you're construing it as flat or tending towards flat as the judge did, and we have an issue with the judge's claim construction, then I think you can find that when you look at the plane. But all the figures in your patent and all your descriptions are flat. I agree with that, Your Honor, but I think when we look back at the amendment that was made, and I think there were some remarks that there was no evidence in the record whatsoever of why these amendments were made. And what was meant by when you have these amendments, why it would be that they were unforeseeable or what they could possibly mean. The first thing on that is that this is not an amendment to get around prior art. There is no discussion in the record of any rejection. And what's important to know is even before the amendments were made, even before those amendments were made, when you look back, there was already allowance of Claim 1, which is the apparatus claim, against which this device is being measured. And the only difference that occurred with respect to the method claim is that there was some additional information about having a process step so you're actually cutting through cheese and stirring the cheese curd. So I think that's the first thing, that there is no prosecution history that you're trying to get around. The second thing is when you look at the file history, what you find is that the applicant was very clear about what was being done with the entire set of amendments. And when you look at that entire set of amendments that were made at the last go-around, what you find is they defined very particularly pages A233 and 234 of the appendix, that what they were doing is they were saying two things really. We're going to reorient the agitator panel, which is basically this device, so that now we're not having both go in co-rotation, they're going in counter-rotation on the shaft. And then you have to flip the panel the other direction in order to make that work. That's right. And that was new. That was new, Your Honor. And non-obvious. And non-obvious. And so what happened is, so first they're saying we have this means for mounting, which is the reorientation, and we're being very clear about what we're doing. But somewhere in that prosecution we get the language generally in the same plane. Where does that come from? Well, I think it starts out at two things. There's a handwritten lying in respective planes. That language is rejected, and eventually what happens, it's the edges disposed. And so let's start there. It's the edges. It's not the entire apparatus. It's not we're claiming basically a picture patent on what we show inside the specification. What we're doing is we're claiming the device overall, and we're making very clear that the edges that cut are on one side, and that's the only edges, and that's emphasized in the prosecution history, and that the edges that stir are on the other side. So you're really doing one thing at a time. And if you look at the claims before that amendment was made, you could see a situation where somebody could say, well, you could have both stirring edges and cutting edges on the same face. And until the new language is put in that says both, or the generally common plane, and the edges that are disposed there so that only, language finds its way into the last element of the claim, that only the cutting edges or only stirring edges are there and being used for the processing of the cheese curd. With respect to moving on a little bit on the doctrinal equivalence, there's some discussion. Counsel, answer this for me. What evidence do you have regarding foreseeability? With respect to the foreseeability, I think the judge got it just right, and I think if you look back at the district court's opinion, what you see is the judge looked at all of the art that was presented to her and asked that very question. Is there anything in that art, and that's what Tetra Pak said in their brief, there's nothing in that art that demonstrates any type of curvature to any type of agitation device that's being used in any of these cheeses. Not one. That's the first very major point. Second point is, and, you know, CSI came and they actually filed a patent application years after the filing of the application that led to the 347 patent. Claiming primarily that the curve panels are new and novel. That this basket shape, the way it is, that it is new and novel, and that, therefore, when you look back, and the question is what would one of skill in the art have thought at the time, and Dr. McMahon, who was Tetra Pak's expert, said this, one would not have conceived of looking for curved blades. It was just not something that was out there. But it doesn't mean that they don't function in the same way. And, really, when we look at the function wave result issue. Now, Mr. Fredrickson challenged you on that. He said the record doesn't contain enough evidence to support the doctrine of equivalence in the first place. I think that's wrong, Your Honor, I think for the following reasons. First, the question is, what is the function that is being described in the patent? The function that is described in the patent is cutting cheese curd and stirring cheese curd. That's it. It's not doing it in such a way that there is some measurable quantity of additional fat solids that are now part of the cheese curd, or that you have minimized in some way the whey that is produced, which is kind of a byproduct of what goes on when you cut or you stir the cheese. And so what you're really looking at is, does it do the functional things that the device requires? Does it cut in such a way that, whether you're cutting up or you're cutting down, that you have these blades trailing each other through this common volume? That's all. I think to try and say, well, you know, it pushes and pulls. The fact is, their expert, their fact witnesses, all acknowledge the device cuts and the device stirs. And, in fact, that's part of their argument on obviousness. Everybody would know that if you run a blade through a cheese curd, it will cut it. If you run it the other way, it will stir it. And so, in effect, what you really have is there is no doubt there is sufficient evidence, and the judge cites to it down at the district court level. And she was allowed to rely on that evidence. And there really was no evidence on the other side. There was speculation about perhaps the way it cuts is a little different. But there's no indication that that is the objective. Wasn't there evidence as to the result of the cutting? There was evidence of the result of the cutting put in, but it was not considered by the district court judge. It was part of the prosecution history. There was no testing that was done by CSI when they were doing their analysis against us down at the summary judgment level. Well, going on, with respect to really when you're looking a little bit at this unforeseeability issue, I think that when you're looking at that, you understand that first when you have a device like this that is new and where there is a spark, and I think this is one of the things that gets into the obviousness arguments, which is there's a combination of arguments that are made by CSI, and a lot of them relate to this idea that you can construct a new device just simply because it's common sense to do so. And I think one of the things we refuted in our papers, in the brief, but also at this point, is that sometimes when you have an invention in front of you, sometimes when somebody comes up with something, it can seem so simple in hindsight. And I think that's part of the difficulty here. People are looking and saying, well, it works. It does what it was supposed to do. And look how easy it is to do. All you have to do is turn the panel around, and when you look at Mr. J, who was the expert and actually one of the patentees against the 504 patent, the 559. Contra rotation and the flipping of the panel, right? That's right. It's both of those, and there are other elements associated with it, none of which are taught by the 559 or the 907J patent, and really there's no motivation to do so. And so when you look at some of the arguments that were made by CSI, they really seem to fall flat on that. There is a procedural issue here, isn't there, in using summary judgment on something as factual as an equivalence question? Well, I think, Your Honor, when you have the record that's before you at the trial court level, you're entitled to rule on summary judgment if there are no genuine issues of material fact with respect to equivalence. And so when we get back to it and we look at equivalence or we look at this device and what it does and some of the testimony that's of record, including the testimony of CSI's experts, you're really talking about cutting and you're talking about stirring, not about particular ways of cutting. For example, in some of the other patents, they talk about cross-cutting or toroidal flow cutting, things that are different in kind and may have some way that you can test them, but that's not something that's part of the 347 patent. The 347 patent, in many ways, it's simple because it says reorient and then come up through and come down through. And when it does that, it ends up, and there's some evidence of record, that it ends up taking over the market. And there's a reason for that, because sometimes these simple things are the things that make the big difference. Now, looking... And with respect, Your Honor, I think one of the issues that's raised and hasn't been discussed a lot here is the plain construction that the judge came up with. When she applied it for doctrinal equivalence purposes, so she had come up with and she believed that her construction was right. And for purposes of our briefing, we accept that construction, in the end, Tetra Pak, did win the summary judgment determination on doctrinal equivalence. And so we believe that the application is correct. I think when you look back and you step back, we believe that a more appropriate construction, which really looks at the surface of the cutting surface or the stirring surface, which is really what this generally common plain is looking at, is really what gets you to an opportunity to do both literal infringement or certainly doctrinal equivalence infringement. And I think there was one issue that was raised by Mr. Fredrickson. I think he brought up the idea that... He brought up the idea that simply having a curved blade, this idea that there's a simple structure and that they were attempting to design around is somehow an indicator of the fact that this model should be something that's outside the plain scope. But I think this gets right back to the foreseeability issue and the fact that you really don't need to kind of delve further into that. And so I think when you step back and you look at what the district court did, the district court determined on a proper record whether or not there was equivalence. She found all of the elements, everything literally, except for the one thing that she said was doctrinal equivalence. And I think when you look at that, it's just important to know the infringement is there. And when you get to the ideas of obviousness, it's clear that there is, when you look back, there was nothing that really could spark putting these together. I have a lot of time, but I don't think there's any real reason for me to continue unless you have further questions. Thank you, Mr. Gerthorn. Thank you, Mr. Frederickson. You have five minutes. Just a couple of points. Your Honor, you want to raise the issue with counsel about the evidence of equivalence, functionally resolved. I may have missed something. I heard a lawyer argument, but I didn't hear any reference to any evidence. Particularly notably, he didn't back up his expert and say that his expert had walked through the functional way result test or the insubstantial difference test. He's happy to tell you all about it and argue all about it, but as the Court is well aware, it requires evidence in the record that has to be linked by lawyer argument. And as I alluded to, the Mike and Composites case, there's a lot of lawyer argument in that case too, but the underlying fact evidence was not there to sustain a finding under the doctrine of equivalence. At worst, it's our position that, as the judge pointed out, this is a factually intensive issue. We've got a battle of experts, and it's our contention that the judge didn't disqualify our experts and say there was no motion eliminating disqualifying our experts. They were qualified experts. He just said their testimony is unreliable. Warner Jenkinson has a rather famous footnote in which after going through doctrine of equivalence as a factual issue, they encourage summary judgment. Doesn't that apply here? Your Honor, I will never deny that summary judgment in the appropriately supported case is appropriate, and I'll tell you as a litigant, I believe it's a very valuable tool for the courts to resolve cases. But the record's got to be there, and they made no serious effort whatsoever in our judgment to provide evidence that would support findings under the doctrine of equivalence. We said this in our brief, and I just want to point it out again. You didn't quite say it, but counsel alluded to the suggestion that this generally common plain limitation was necessary to make sure the cutting edges were on one side and the stirring edges were on the other. It's in our brief. The language before the amendment required the cutting edges be on one face and the stirring edges be on an opposite face. So this language that was added was not talking about them being on opposing faces, how the cutting edges related to the stirring edges, but how the cutting edges related to one another and how the stirring edges related to one another, and there's no explanation in the record why that mattered. Unless the court has any further questions, I don't have anything else that I feel compelled to add at this point, Your Honor. Thank you, Mr. Frederickson, and the court thanks all counsel.